FILED
06/17/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2025 Session

## STATE OF TENNESSEE v. ALEXANDER FRIEDMANN

**Appeal from the Criminal Court for Davidson County**
**No. 2020-A-405     Steve R. Dozier, Judge**

_____

**No. M2023-00314-CCA-R3-CD**

_____


A Davidson County jury convicted the defendant, Alexander Friedmann, of vandalism of property over $250,000, for which he received a sentence of forty years in confinement at 35%. On appeal, the defendant contends (1) the indictment is unconstitutionally vague and overbroad; (2) the trial court erred in admitting evidence of the costs to rekey the jail and review surveillance footage; (3) the trial court erred in denying a motion to suppress the product of a judicial subpoena; (4) the evidence presented at trial was insufficient to support his conviction; (5) the State failed to timely provide evidence to which the defendant was entitled; (6) improper argument by the State affected the verdict; (7) the trial court imposed an excessive sentence; (8) the trial court erred in denying the defendant's motion for a reduced sentence; and (9) cumulative error deprived the defendant of a fair trial. After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Benjamin K. Raybin and David L. Raybin, Nashville, Tennessee, for the appellant, Alexander Friedmann.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General and Abigail H. Hornsby, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger Moore and Amy Hunter, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

### Facts and Procedural History

This appeal arises from the defendant's actions during the construction of the Downtown Detention Center ("DDC") in Davidson County, Tennessee between August 2019 and January 2020. Following an investigation, the defendant was charged with one count of vandalism of property over $250,000.

### I.      Pre-Trial Proceedings

#### A.      Motion to Exclude Cost Information

On November 21, 2021, the defendant filed "Defense Motion to Exclude Certain Cost Information" in which he moved to exclude "all proof of any pecuniary losses alleged that [did] not go directly to proving the necessary elements of the offenses," specifically "any costs incurred from re-keying locks and the Sheriff's Office staff reviewing security camera footage." The defendant argued these expenses did not constitute the "fair market value" of the property that was vandalized and were, therefore, irrelevant and unfairly prejudicial. A pre-trial hearing was conducted on December 2, 2021, during which the defendant argued that the costs the State wished to introduce at trial, namely the costs to rekey locks and review surveillance footage, constituted restitution and should not be included in the valuation determination. The State disagreed and argued that determining value is a question for the jury and should not be decided by the court prior to trial.

After its review, the trial court issued an order denying the defendant's motion to exclude the cost information, finding "the jury's purview in determining valuation for vandalism is clearly established in both [the] statute and pattern instructions." The trial court also found that admitting authenticated proof of costs or expenses would not confuse or mislead the jury.

#### B.      Motion to Suppress the Product of a Judicial Subpoena

On May 20, 2022, the defendant filed a motion to suppress the product of a judicial subpoena, moving to suppress all documents produced pursuant to the subpoena as well as all derivative evidence. The defendant argued the subpoena was defective because it lacked an affidavit, failed to provide articulable reasons or a nexus, and had an unreasonably broad request. The defendant also argued the officers should have requested a search warrant based on probable cause. The trial court conducted a pre-trial hearing on July 13, 2022.

At the hearing, Aimee Bobbitt testified that she was an attorney and notary who previously worked at The Law Office of Gary Temple. While working for Mr. Temple, Ms. Bobbitt performed notary services for members of the community free of charge. Her normal practice was to check identification, inform the person that she would keep a copy of their identification and document, notarize the document, and make copies for her file.

The defendant would often come into Mr. Temple's office to have documents notarized, and Ms. Bobbitt would always go through her normal practice of informing the defendant about copying and retaining the copies of his documents before she notarized anything for him. Ms. Bobbitt testified that she never charged the defendant for her services or held herself out as an attorney during their transactions.

On cross-examination, Ms. Bobbitt testified that she kept copies of the documents because it was "something [she had] developed over the last several years." She agreed that the National Notary Association recommended notaries keep a journal and that they did not recommend notaries make copies of notarized documents. Ms. Bobbitt also testified that the copies were not for the benefit of the law office and that she would not give them to a third party without the person's permission because it would not "be relevant."

Gary Temple testified that the defendant came into his law office multiple times to have documents notarized by Ms. Bobbitt. After the defendant's arrest, a sheriff's deputy came into the office to serve some papers and mentioned that the defendant lived in the same neighborhood as Mr. Temple's law office. Mr. Temple told the deputy that the defendant was in his office the previous day. Following this conversation, a detective came to Mr. Temple's office, and a short time later a judicial subpoena was issued for the defendant's notarized documents.

Detective Robert Anderson, a retired detective with the Metro Nashville Police Department ("MNPD"), testified that he was assigned to lead the investigation in this matter. Detective Anderson stated that Lieutenant Brian Anderson informed him that they received a tip regarding the defendant's notarized documents at a law firm and suggested they subpoena the documents.

The defendant testified that he had many documents notarized at Mr. Temple's law office, including an advance healthcare directive, a power of attorney for his wife, a judicial complaint, and a letter authorizing someone to clean out his storage area in the event of his death. The defendant agreed that he did not have an attorney-client relationship with Ms. Bobbitt or anyone at the law office. He denied giving Ms. Bobbitt permission to copy his documents and stated that he would not have allowed her to notarize them if he had known she was going to make a copy. The defendant testified that he "occasionally saw [Ms.

Bobbitt] with copies of [his] driver's license" but was given no indication that she had also copied his documents. It never occurred to the defendant that Ms. Bobbitt would copy his documents because he previously worked for attorneys who notarized documents, and they did not keep copies of their notarized documents. He also stated that he had documents notarized for twenty years and had never known a notary who kept copies of the notarized documents.

Following the defendant's testimony, the State argued the "entire motion [was] moot because there [was] no standing." According to the State, because the judicial subpoena was directed to Mr. Temple's law firm and the defendant admitted there was no attorney-client relationship with anyone at the law firm, the defendant did not have standing to challenge the subpoena. The defendant argued that he had an expectation of privacy in the documents that were notarized and copied.

After its review, the trial court issued an order denying the defendant's motion to suppress the product of the judicial subpoena finding the subpoena, while "imperfect," met the "bare bones" of what was required.

### C. Motion to Exclude Undisclosed Evidence

On July 6, 2022, the defendant filed a motion to exclude any "undisclosed State's evidence or argument." The defendant stated that he was unaware of any such evidence but sought to preemptively raise the objection "out of an abundance of caution." The trial court granted the motion without opposition from the State during a pre-trial hearing on July 13, 2022.

On July 15, 2022, the defendant filed a second motion to exclude undisclosed evidence from the State. The defendant argued that, despite the trial court's prior ruling, the State provided new evidence, Investigator Warren Ford's forty-two-page internal report, on July 14, 2022. The defendant was, therefore, seeking to exclude any testimony from Investigator Ford, Lieutenant Thomas Conrad, and Chief Timothy Dial. The trial court conducted a hearing on July 18, 2022, during which the defendant requested that any witness who was not listed on the indictment be excluded from testifying at trial. The defendant argued that he was only notified of the additional witnesses a month before trial and this, combined with the late disclosure of Investigator Ford's report, hindered his ability to effectively prepare for the trial. When the trial court mentioned the possibility of a continuance multiple times, the defendant stated that he "absolutely [did] not want a continuance" and that he "would rather go forward with the trial." The defendant also worried that he did not "know what is going to come out. Are there going to be more documents[?]" The trial court answered that "they wouldn't be admitted." The State

- 4 -

agreed that Investigator Ford's report contained "Rule 26.2 *Jencks*[1] statements" but denied that it contained any exculpatory information. However, the State argued that there was nothing new in the report and that the defendant had access to the information "for literally years." At the conclusion of the hearing, the trial court asked the defendant if he wished to withdraw his motion to dismiss. The defendant declined to do so, and the trial court stated that it was not going to grant the motion and would only grant a continuance. The defendant reiterated that he was not asking for a continuance and was "either asking for a dismissal or [to] move forward." The defendant then proceeded to trial.

## II.    Trial Proceedings

### A.    Trial

Sheriff Daron Hall with the Davidson County Sheriff's Office ("DCSO") testified that he was involved in discussions to replace the Criminal Justice Center ("CJC") in Davidson County with an updated building. Eventually, the decision was made to demolish the CJC and build the DDC in its place, and the county contracted Bell and Associates to complete the project. Sheriff Hall testified that the DDC was originally scheduled to open in January 2020, and construction began approximately two years prior. During construction, Sheriff Hall often had meetings regarding the facility. While the defendant, who Sheriff Hall knew as an advocate against private prisons, was not involved in those meetings, Sheriff Hall recalled the defendant attending meetings regarding the future of a private prison facility in Nashville "on a regular basis." However, Sheriff Hall later learned the defendant was privately requesting "things about the new building [such as] pictures of the cells, where's the law library going to be."

During the initial phases of construction, the DCSO did not provide any security for the area. However, in November 2019, the DCSO began staffing the building in preparation for the DDC's expected opening in January. A security team began monitoring the building twenty-four hours a day while the staff was training. During this time, construction was ongoing, and construction workers were a common sight in the building.

Sheriff Hall testified that he wanted the DDC to have "the best security measures [] possible" because the building needed to handle the most serious offenders in the city. The "lifeline of the security of the operation" was the key system used by the DCSO. According to Sheriff Hall, "you can't secure a building or secure an environment without assurance that the keys are in check." On December 30, 2019, Sheriff Hall learned that one of the key rings had been "tampered with" and that keys were missing. Sheriff Hall authorized an investigation into the matter which included reviewing "thousands and thousands of

---

[1] Tenn. R. Crim. P. 26.2; *Jencks v. United States*, 353 U.S. 657 (1957).

hours" of surveillance video footage. After viewing the defendant on surveillance video, a plan was developed to secure him if he came back onto the property. On January 4, 2020, Sheriff Hall received a phone call saying that the defendant had returned to the DDC disguised as a construction worker and was detained by officers.

Sheriff Hall testified that, following the defendant's actions, there was no alternative other than rekeying every lock in the building. Although the defendant was only seen on video taking one set of keys out of the building, it was possible he took more than one, as the video footage showed the defendant in the building multiple times over several months. Additionally, one of the keys the defendant removed from the building was a "general movement key" which opened "virtually every door inside of the facility," and Sheriff Hall had no way of knowing whether the defendant made copies of this key while it was in his possession.

On cross-examination, Sheriff Hall agreed that he made a number of public statements about this case including that "no inmate in [Sheriff Hall's] time deserves to be in restrictive housing more than [the defendant]." Although Sheriff Hall agreed the keys the defendant stole were high security and hard to copy, he testified that he did not believe they could not "be redone." Sheriff Hall disagreed with a news release from his office early in the investigation that stated only eighty-five locks would need to be replaced and reiterated that his "instruction was to replace all of the locks inside the jail." He agreed that lead counsel[2] returned the two missing keys on January 8, 2020, and there was no physical damage to the keys. On redirect examination, Sheriff Hall testified that when the initial statement was made indicating that eighty-five locks would need to be replaced, all of the video footage had not been reviewed.

Lieutenant Thomas Conrad with the DCSO testified that he was a shift supervisor in 2019 and assigned to assist in the opening of the DDC. Lieutenant Conrad was "in charge of equipment" and assisted Chief Timothy Dial with the key system. In anticipation of the expected arrival of inmates in January 2020, Lieutenant Conrad and Chief Dial built key rings for the officers to utilize. Lieutenant Conrad testified that the keys were "high security keys that are imperative to be kept under control and understand who has them." To that end, the keys were kept in a key control room, labeled, counted, and placed strategically on hooks. The key rings used by the DCSO were horseshoe-shaped and held together by a color-coded hub, which locked the ring in place. Additionally, each key ring had a "chit," which was a brass, circular disk describing the type and number of keys contained on the ring. Lieutenant Conrad testified that the hub "mechanically lock[ed] on

---

[2] The defendant was represented at trial by two attorneys. For clarity, we will refer to them individually as "lead counsel" or "co-counsel" and collectively as "trial counsel."

each side of the opening" of the key ring and that once the hub was broken, it could not be put back together.

Lieutenant Conrad testified that all of the keys for the building were placed in the key control room prior to the 2019 Christmas break. On December 30th, when Lieutenant Conrad returned to the key control room, he noticed one of the key rings was "out of the norm." The key ring was circular instead of the standard horseshoe shape, and when Lieutenant Conrad counted the keys, which were marked "maintenance," he noticed two keys were missing. Lieutenant Conrad immediately alerted Chief Dial, who also counted the keys and two keys were missing. At that point, they notified the administration of the situation and reviewed the key records, determining that a GM, or general movement, key and a kitchen padlock key were missing. Lieutenant Conrad testified the kitchen padlock key opens various things in the kitchen, such as walk-in refrigerators. He testified that a person could use the key to hide in an area, and therefore, it "compromised security as much as a high security key." The GM key opened doors "inside the hallway of all the floors," including stairwell doors. The removal of the GM key "greatly compromised security," because once a person was in the stairwell, they were only one door away from the outside.

Lieutenant Conrad then began watching surveillance footage, starting from the time he identified the keys were missing until approximately noon on December 27th. During his review, he observed what appeared to be a construction worker enter the key control room, pick up a set of keys, place them in his pocket, and leave. Two hours later, the same construction worker returned with a circular key ring, which he placed on the hook in the key control room.

Lieutenant Conrad testified that "[t]here was no reasonable alternative" than to rekey every lock in the building following the defendant's actions. Because the entire maintenance key ring had been removed from the building, it was impossible to know whether any of the keys had been copied. According to Lieutenant Conrad, the maintenance key ring accessed "90-some percent of the facility," and the tampering with and removal of the keys "irreparably harmed the security of the building."

On cross-examination, Lieutenant Conrad agreed that none of the keys on the maintenance ring went to the cell doors or the outer doors of the building. He also agreed that he was asked to track the amount of time he spent working on the case, including the amount of time reviewing video footage.

Brian Beazley, an application support technician with the DCSO, testified that he managed the security electronics for the DCSO, including security cameras. During the construction of the DDC, approximately six hundred and fifteen security cameras were

installed. The cameras began "coming online" in phases beginning in June of 2019 and ending in August or September. In the DDC's central control room, officers were able to choose specific cameras to view; however, they were not able to view the video from every camera at once. On December 30, 2019, Mr. Beazley was notified that he needed to report to the DDC to assist in reviewing video footage. After discovering the extent of the defendant's actions, Mr. Beazley was "pulled off of technology full-time and put on [the defendant's] case of reviewing video footage full-time." Mr. Beazley's main role was to track and pull footage every time the defendant was on camera. Mr. Beazley testified that he tracked his time spent reviewing video footage, including "a lot of overtime," and submitted it to his supervisor.

When Mr. Beazley was originally assigned to review the video footage, the only information they had was that the defendant had taken a set of keys. However, as more video was analyzed, Mr. Beazley observed the defendant repeatedly going to a spot in the north stairwell and reaching on top of a beam. Mr. Beazley went to the location from the video and located a pry bar. Following his discovery, he immediately contacted Investigator Warren Ford.

Investigator Warren Ford with the DCSO testified that he received a call on December 30, 2019, concerning a breach at the DDC. After speaking with Lieutenant Conrad and Chief Dial, Investigator Ford reviewed the video footage of the defendant removing the keys from the key control room. Because they believed the defendant might return to the building, a plan was devised where screenshots of the defendant were distributed to the staff and instructions were given to lock the building down if he attempted to enter again. On January 4, 2020, Investigator Ford was informed that the defendant was secured in the sally port of the DDC. Investigator Ford and officers from the MNPD arrived at the scene, and the defendant was taken into custody.

Because of the breach of security, administrators at the DDC determined that all of the available video footage should be reviewed. Several people were assigned to review the video footage, and if they discovered footage of the defendant entering the building, they were to send the footage to Mr. Beazley and Investigator Ford to review. At that point, Mr. Beazley and Investigator Ford would confirm whether it was the defendant and follow the defendant's movements throughout the building, taking detailed notes of the defendant's actions.

Surveillance videos from the DDC were entered into evidence. Between August 9, 2019, and December 27, 2019, the defendant was observed walking throughout the building, including in the stairwells, general population area, medical unit, holding cells, vehicle sally port, master control room, key control room, restrictive housing unit, staff dining room, kitchen, shower area, booking area, and visitation area. The defendant taped

a sign on a bathroom door in the medical unit instructing others not to close the door. The defendant often took notes on a clipboard and was observed picking up keys and attempting to use them on various doors. The defendant also placed a set of blueprints that were on a table in his pocket. Several times, the defendant was observed covering security cameras. The defendant could be seen carrying a grinder, hammer, chisel, drill, paint, and caulk. He was also seen cutting and drilling into multiple walls, placing items into the walls, and using caulk, a putty substance, and paint to repair the damage. At various times, a man later identified as Paul Cunningham as well as another unknown individual entered the building with the defendant and appeared to act as a lookout.[3]

The security video also revealed that at 10:34 a.m. on December 27, 2019, the defendant entered the building from the access point at the back dock. He entered the key control room and propped the door open. Investigator Ford testified that someone would have let the defendant into the key control room because the door would have been locked at this point. The defendant begins painting the door but then removes a set of keys with a yellow security hub from the wall. He attempts to remove the hub with a screwdriver but is unable to open the key ring. The defendant places the key ring in his right pocket and leaves the building at 10:59 a.m. At 12:54 p.m., the defendant is seen reentering the building with a five-gallon bucket and a paint can. He again props open the door to the key control room, takes a circular key ring with a yellow hub out of his pocket, and places it in the area where the original key ring was removed. The following day, the defendant is seen returning to the key control room, examining multiple key rings, and making notes on his clipboard. Eventually, the defendant removes a set of keys and walks around the building, using the key ring and making notes on his clipboard as he tries various locks. On cross-examination, Investigator Ford agreed that he did not use the word "vandalism" in his 42-page report.

Lynette Mace, Angelo Iessi, and Douglas Belcher with the MNPD's Crime Scene Investigation Unit processed the DDC, photographing and collecting all evidence. They met with Investigator Ford and Detective Robert Anderson to inspect areas where the defendant was observed. In the visitation area, Ms. Mace noticed the paint sheen was different on the bricks on the inmate's side of the second visitation booth. Inside the brick, a .22 Derringer, ten cartridges, two handcuff keys, and a razor blade were discovered. In the third booth on the inmate's side, Ms. Mace located two holes that had been drilled through to the visitor's side. Inside waiting room No. 1 of the medical unit, a Ruger .38 special revolver, 11 cartridges, a razor blade, three handcuff keys, an unknown key, and a security bit were located in the wall behind the mirror. Inside waiting room No. 2 of the medical unit, a .9-millimeter Derringer, three handcuff keys, and eight cartridges were found hidden in the wall behind a mirror. Mr. Iessi collected a "long razor" that was found

---

[3] Mr. Cunningham died prior to trial.

inside the wall of the medical unit.  Tool kits, which Ms. Mace described as a package consisting of two handcuff keys, a razor blade, a saw blade, and a security bit, were located in the grout outside of the door of waiting room two, in an inmate restroom, at the security desks in Pods A, B, C, and D, in bay 4D near a fire exit, in the pod area of the restrictive housing unit, in the corner of the walls of pod 4-C, outside of a multipurpose room, and in bay 4F near a shower stall.  Security bits were located in the grout outside of waiting rooms one and two and inside an inmate restroom.

Chief Timothy Dial with the DCSO was assigned to "establish post-orders, assemble a key system, order equipment, [and] train staff" during the construction of the DDC.  Upon being advised that two keys were missing, Chief Dial checked the key inventories to determine which keys were compromised and alerted his direct supervisor.  Chief Dial testified that the key ring the defendant returned to the DDC was circular in shape, the hub appeared to be damaged, and there was tape around it.  Although Chief Dial described the initial discovery of two keys being missing as a "huge deal," he testified that once they reviewed video footage and discovered the key ring had left the premises for a period of time, "every single key on the key ring was compromised," resulting in a "very large, large security breach."  According to Chief Dial, the key ring taken by the defendant included, in part, approximately four detention keys that went to "100 or so doors" and a commercial master key that opened every door that was not a detention door.  Chief Dial testified that there was no way of knowing whether these keys had been copied before being returned to the building.  The removal of the key ring from the building, combined with the "knowledge [the defendant] gained walking around, testing doors," gave the DSCO "no other option but to rekey everything."

Chief John Hudson, the Chief of Administration for the DCSO, testified that the county was charged for having the locks rekeyed in the DDC following the defendant's actions.  Bell and Associates, who completed the initial construction on the building, completed the rekeying and submitted a bill for $291,721.  Additionally, after the defendant's actions were initially discovered, video footage was reviewed by several employees of the DCSO.  Chief Hudson testified that "video reviewer" was not a job that existed at the DSCO, so employees were taken away from their normal duties and tasked with reviewing the footage.  While most of the footage was reviewed during regular business hours, some overtime was paid.  Chief Hudson submitted a summary of the hours worked reviewing the video footage which was prepared by one of his subordinates.  Chief Hudson testified to the accuracy of the figures in the spreadsheet and stated that the total cost to review the video footage was $335,777, including $55,443 in overtime pay.

On cross-examination, Chief Hudson stated that Pete Lutz, the Director of Finance for the DCSO, compiled the timesheet information and prepared the spreadsheet.  Chief Hudson agreed that he did not watch Mr. Lutz prepare the spreadsheet or double-check the

information for accuracy. Chief Hudson also agreed that the regular pay and benefits included in the spreadsheet were money that would have been paid to employees regardless of whether they reviewed video footage. Chief Hudson testified that every hour reflected on the spreadsheet was spent watching video footage.

Detective Michael Osuna with the MNPD assisted with the execution of a search warrant at the defendant's residence and located a pack of razor blades, several sets of keys, a white N95 mask, and handcuff keys. On cross-examination, Detective Osuna agreed that he did not locate any keys that went to the DDC at the defendant's residence.

Greg Hall testified that the defendant is his "daughter's first cousin [] on [Mr. Hall's] wife's side" and that he had known the defendant since he was a teenager. Mr. Hall, who worked in renovations and remodeling, recalled that in 2018 the defendant asked him to build a fireproof secure room in the basement of a storage building Mr. Hall owned. The defendant requested the room be made from concrete blocks and be "12 by 15 or less with a partition wall in the middle with a lockable door on that side as well as a lockable entry door." The defendant, who was employed at a law firm at the time, told Mr. Hall that he wanted to use the room to store legal documents. Mr. Hall completed the room to the defendant's specifications and turned the keys over to him. Several photographs of the room were entered into evidence showing drill holes in the cinder block and repair work in the grout. Mr. Hall testified that the room had not been in that condition when he gave the keys to the defendant. During an interview with the MNPD, Mr. Hall was asked to review several photographs. Although Mr. Hall agreed that he identified the defendant on every photograph, he testified that "some of them [] were indistinct, because I told the officer that was interviewing me that to the best of my knowledge that looked like it could be [the defendant]." On cross-examination, Mr. Hall agreed that the defendant wrote him a check in 2015 not 2018 to begin work on the storage room.

Lieutenant Cory Witkus, a security lieutenant with the DCSO, testified that he was contacted in December of 2019 to assist in the development of a plan in the event of the defendant's return to the DDC following the discovery of the missing keys. It was decided that the defendant would be let into the building and discreetly escorted to the sally port area, where the defendant would be secured until MNPD and Investigator Ford arrived. On January 4, 2020, the defendant approached the locked entrance of the DDC, and Lieutenant Witkus, who immediately recognized the defendant's face, opened the door and asked the defendant why he was there. The defendant responded that he was "going to work," and Lieutenant Witkus led the defendant to the sally port. As soon as Lieutenant Witkus secured the defendant inside the sally port, he radioed Chief Dial and Lieutenant Conrad to notify them of the defendant's location. The defendant briefly yelled for someone to let him out. He then appeared to place something in his mouth and chew on it.

At times, the defendant could be observed digging in a trash can and sliding a piece of paper under a door.

Officer James Hill with the MNPD responded to a trespassing call at the DDC. When he arrived on the scene, Investigator Ford and Lieutenant Witkus briefed him on some of the activity that had occurred at the DDC in the prior week. Upon entering the sally port, Officer Hill detained the defendant and placed him in the back of a patrol car. Afterward, because he learned the defendant was rummaging through a trash can, Officer Hill examined the trash can and recovered a set of purple medical gloves and some torn-up pieces of paper. He also located the defendant's medical ID, which had been slid underneath a door, a red Igloo cooler, and a hard hat. Inside the cooler was a set of bolt cutters, Brasso metal polish, painter's tape, a doorstop, a paint brush, two screwdrivers, an assortment of screws, a rag, and a pair of safety goggles. Officer Hill also recovered a can of white or cream paint and a 24 hour lock and key business card. In reviewing the torn pieces of paper, Officer Hill testified that he recognized key words such as "inmate area," "commissioner," "inmate file area," "DCSO," "law enforcement staff toilet," "screening window," "video conference attorney," "bonds," and "pretrial screening." Officer Hill also testified that he recovered the defendant's shoes because they appeared to be the same shoes that the defendant was wearing in the video footage when the keys went missing. On cross-examination, Officer Hill agreed that he did not know when the trash can had been emptied prior to the defendant's arrest. He agreed that the defendant was charged with attempted burglary, possession of burglary tools, and tampering with evidence as a result of this incident.

Chief Tony Wilkes, the Chief of Corrections for the DCSO, testified that he was involved in the planning of the DDC beginning in 2015. Once construction on the new building began, Sheriff Hall placed Chief Wilkes in charge of the transition to the DDC. According to Chief Wilkes, the key system "is the gateway to [the] correctional facilit[y]," and the facility "must have total accountability, control, inventory, [and] issuance of keys when you are operating a correction facility."

Chief Wilkes first became aware that keys were missing from the DDC on December 30th when the jail administrator informed him of the situation. Although he was initially concerned about the missing keys, once he learned about the extent of the vandalism, "[i]t changed the game." Chief Wilkes emphasized how important it was to review the video footage and determine all of the sites where the defendant had hidden contraband because the defendant "strategically placed th[o]se devices, razors, cuff keys inside of housing units, in front of the officer workstation and always [] it was in hidden in plain view." Additionally, "the weapons [and] contraband [were] found in those areas that are common areas, the medical unit, the visitation, that's where groups of individuals can go and congregate."

- 12 -

Prior to January 4, 2020, Chief Wilkes was familiar with the defendant and knew him as an advocate in the correctional community. Chief Wilkes recalled being in "one or two" meetings with the defendant regarding corrections, including discussions of some of the features of the DDC. The defendant specifically asked about the visitation areas in the DDC and how technology would affect in-person visitation. When Chief Wilkes saw the defendant on the day of his arrest and realized he was the person who had taken the keys, Chief Wilkes "went blank." Because the defendant had professional experience with the criminal justice system, it "changed everything" to know that "someone like that who talked advocacy under this umbrella of doing good [was] a part of some type of sabotage."

The defendant declined to present evidence. Following deliberations, the jury convicted the defendant of vandalism of property over $250,000.

### B.     Sentencing Hearing

Prior to the sentencing hearing, the defendant submitted a letter to the trial court in which he apologized for his actions and expressed remorse "for the impact that [his] crime has had." He emphasized that he acted alone and took sole responsibility for his crimes. He stated that there was "no rational basis" for his actions and explained that he had been the victim of a gang rape while incarcerated in the CJC in 1987. When he toured the CJC in 2018 prior to its destruction, he visited the cell where his rape occurred "to obtain closure," and while his escort waited down the hall, he "broke down and cried for several minutes." Following the tour, the defendant began having "intense flashbacks," nightmares, and panic attacks. "To deal with this mental and emotional distress, [the defendant] resolved that should [he] ever be jailed again and subjected to the same sexual abuse, [he] would have the resources to escape or defend [himself]." Therefore, the defendant formulated a plan to conceal tools and weapons throughout the DDC as it was being constructed. The defendant stated that he placed "so much contraband at the jail because if incarcerated there [he] didn't know where [he] would be housed." The defendant acknowledged that, because his actions were against the DCSO and because he had filed and won a lawsuit against the Tennessee Department of Correction related to this case, it was unlikely that he would ever receive parole. Therefore, he asked the trial court to sentence him to thirty years, the amount offered by the State prior to trial.

During the sentencing hearing, the State introduced a copy of the defendant's presentence report and certified copies of the defendant's three prior judgments of conviction. Danielle Conner with the MNPD's Crime Scene Investigation Unit testified that she responded to the execution of a search warrant at 7862 Whites Creek Pike on March 20, 2020. During the search, Ms. Conner located several storage totes. Inside the totes, Ms. Conner recovered grenade pouches, magazine pouches, tire traps, Velcro sheriff

- 13 -

patches, gun cases, boxes of ammunition, rifle magazines, two high-capacity drum magazines, various law enforcement patches, holsters, gloves, ear protection, remote firing systems, ballistic armor, handcuffs, a military helmet, tactical gear including leg armor, and 26 firearms. One tote was full of different calibers of ammunition.

Kenneth Elkins, the Director of Hazmat Compliance for the Bureau of Explosives, testified that he previously worked for the MNPD and encountered the defendant on May 24, 1991. Director Elkins received a shoplifting call from dispatch and began driving toward the Kroger on South Gallatin Road. While en route, Director Elkins was informed that the defendant had pulled a weapon on the Kroger manager and fled from civilians who were detaining him at the store. The defendant later lost control of his vehicle and was placed into custody. Upon searching the defendant, Director Elkins discovered a handcuff key "placed at the backside of [his] belt" and "razor blades taped to the backside of credit cards" inside his wallet.

Sheriff Hall testified that he reviewed the defendant's sentencing memorandum and could not confirm the defendant's allegations regarding being raped in 1987 because their records system did not go "live until 2000." Sheriff Hall disputed the defendant's claim that he toured the CJC in 2018, stating that the building was torn down in 2016. Although Sheriff Hall did confirm that the defendant toured the CJC in 2016, the individual who accompanied the defendant on the tour told Sheriff Hall that he "vividly [remembered] escorting [the defendant] through the building," and even remembered the defendant taking photographs during the tour. However, the guide stated that the defendant never went inside a particular cell or had an emotional breakdown while on the tour. Sheriff Hall asked the trial court to sentence the defendant to the maximum sentence possible, stating "[t]here is not a person ever who more deserves the maximum sentence for this charge than [the defendant]."

Denise Davis, the unit manager of Riverbend Maximum Security Institution, testified that the defendant had been assigned to her unit for approximately one year. Ms. Davis stated that the defendant did not have any disciplinary violations or writeups and had "never [given her] any issue whatsoever." Ms. Davis also testified the defendant runs the laundry for the unit and is "good at filing paperwork, [] to ensure that everybody gets exactly everything they are supposed to have."

Christopher Smith testified that he represented the defendant in a civil lawsuit against the State of Tennessee arising out of the conditions of his pre-trial confinement at Riverbend Maximum Security Institution. The defendant had been placed in an iron man cell, a solitary confinement cell with "four steel-plated walls, they are painted dark. The lighting [is] poor. The window is half of the size of regular cells. There is no stool, there is no table, there is no electrical outlet, there is no mirror." The iron man cell is the

"harshest cell assignment" and "historically reserved for punishing inmates." Based on Mr. Smith's legal research, no pre-trial detainee had ever been placed in an iron man cell, and only one inmate had been in the cell longer than the defendant. The defendant's total time in the iron man cell was six hundred forty-four days. The court granted the defendant's preliminary injunction challenging his placement in the iron man cell and ordered the Department of Correction to move the defendant. However, the State did not immediately comply with the ruling, and a contempt hearing was held during which the defendant agreed to be housed in close custody at Riverbend in exchange for reformation of the policy surrounding the use of iron man cells.

The defendant also provided a statement of allocution, repeating much of the information in his sentencing memorandum letter. He asked the trial court to give weight to the numerous letters of support submitted on his behalf.

In sentencing the defendant, the trial court considered the evidence presented during the trial and sentencing hearing, including the presentence report and the arguments of counsel. In reviewing the applicable enhancement factors, the trial court found enhancement factors (1), the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (9), the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; (10), the defendant had no hesitation about committing a crime when the risk to human life was high; and (14), the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense[.] Tenn. Code Ann. § 40-35-114(1), (9), (10), (14). The trial court gave weight to enhancement factors (1), (9), and (10) and little weight to factor (14). In mitigation, the trial court gave minimal weight to the defendant's pre-trial punishment under the catch-all factor (13). *Id.* § 40-35-113(13). After applying and weighing the applicable enhancement and mitigating factors and considering the facts and circumstances of the case, the trial court imposed a sentence of forty years at 35%.

The defendant filed a motion requesting a reduced sentence on February 2, 2023, arguing the trial court's sentencing decision was based on "erroneous information due to limited evidence presented in court." In support of his motion, the defendant submitted an affidavit attesting to his interactions with the two "lookouts" in this case as well as the summary of the interview of one of the "lookouts" by a police officer. The defendant also submitted several photographs from his tour at the CJC in 2016 taken in the cell where he was allegedly raped, rebutting Sheriff Hall's testimony that the defendant did not visit the cell during the tour. On February 7, 2023, the trial court issued an order denying the defendant's motion for a reduced sentence finding the "'other information' [did] not alter its ruling."

- 15 -

The defendant then filed a motion for new trial which the trial court denied. This timely appeal followed.

*Analysis*

On appeal, the defendant argues (1) the indictment is unconstitutionally vague and overbroad; (2) the trial court erred in admitting evidence of the costs to rekey the jail and review surveillance footage; (3) the trial court erred in denying a motion to suppress the product of a judicial subpoena; (4) the evidence presented at trial was insufficient to support his conviction; (5) the State failed to timely provide evidence to which the defendant was entitled; (6) improper argument by the State affected the verdict; (7) the trial court imposed an excessive sentence; (8) the trial court erred in denying the defendant's motion for a reduced sentence; and (9) cumulative error deprived the defendant of a fair trial. The State contends (1) the indictment provided adequate notice of the charged offense; (2) the trial court properly denied the defendant's motion to exclude the costs to rekey the jail and review surveillance footage; (3) the trial court properly denied the defendant's motion to suppress the judicial subpoena; (4) the evidence is sufficient to support the defendant's conviction; (5) the defendant is not entitled to relief for the delayed disclosure of Investigator Ford's file; (6) any error in the State's closing argument was harmless; (7) the trial court properly exercised its discretion in sentencing; (8) the trial court properly exercised its discretion by denying the motion for reduced sentence; and (9) the defendant is not entitled to cumulative error relief.

## I.    Indictment[4]

The defendant styles his argument as one challenging the indictment as unconstitutionally vague and overbroad. However, it is clear from the reading of the defendant's brief that his actual challenge is one of sufficient notice, claiming the indictment charged the defendant with vandalizing real property, while at trial, the State produced evidence that he vandalized personal property. The State contends the indictment provided adequate notice of the charged offense.

Challenges to the validity of an indictment or presentment present questions of law and, this, are viewed *de novo*. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). The Sixth and Fourteenth Amendments to the United States Constitution require the accused "to be informed of the nature and cause of the accusation." *See also* Tenn. Const. art. I, § 9. "As Tennessee courts have held, in order to satisfy the constitutional requirement, an indictment

---

[4] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the defendant's brief.

or presentment must provide a defendant with notice of the offense charged, provide the court with an adequate ground upon which a proper judgment may be entered, and provide the defendant with protection against double jeopardy." *State v. Byrd*, 820 S.W.2d 739, 740-41 (Tenn. 1991); *see also State v. Duncan*, 505 S.W.3d 480, 484 (Tenn. 2016). A "valid indictment is an essential jurisdictional element, without which there can be no prosecution." *Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998). Tennessee Code Annotated section 40-13-202 states:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

Indictments are reviewed from an "enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." *Hill*, 954 S.W.2d at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). This Court has repeatedly held that an indictment meets statutory and constitutional requirements if it "achieve[s] the overriding purpose of [providing] notice to the accused," noting the Court's "relaxation of common law pleading requirements and its reluctance to elevate form over substance." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). "It is generally sufficient for the indictment to state the offense in the words of the statute." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010). Additionally, "theories available to support a conviction of [an] offense [are] not required to be included in the indictment." *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999); Tenn. Code Ann. § 40-13-206(a).

Again, we note that, while the defendant couched his argument in terms of variance, he essentially argued "[t]he indictment here gave insufficient notice that [the defendant] was being accused of vandalizing personal, non-real property." At any time while a case is pending, a court may hear a claim that the indictment fails to show jurisdiction in the court or charge an offense. Tenn. R. Crim. P. 12(b)(2)(B). All other objections to the sufficiency of the indictment must be made prior to trial, or the issue will be deemed waived. Tenn. R. Crim. P. 12(b)(2)(B), (f)(1); *State v. Kennedy*, 649 S.W.2d 275, 279 (Tenn. Crim. App. 1982), *overruled on other grounds by State v. Holt*, 691 S.W.2d 520, 522 (Tenn. 1984). The defendant did not challenge the indictment prior to trial and does not allege that it fails to show jurisdiction or charge an offense. Accordingly, the issue is waived.

Waiver notwithstanding, the indictment was sufficient to inform the defendant of the nature of the charge against him. The indictment alleges:

- 17 -

The Grand Jurors of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that: Alexander Friedmann, a.k.a. Alex Friedmann on divers days from on or about the 30th day of August, 2019 to on or about the 4th day of January, 2020, in Davidson County, Tennessee and before the finding of this indictment, knowingly did cause damage to or the destruction of real or personal property, to wit: Downtown Detention Center located at 448 2nd Avenue North, Nashville, Tennessee of the Metropolitan Nashville Davidson County Government, when Alexander Friedman knew he did not have the effective consent of the Metropolitan Nashville Davidson County Government, the value of which is $250,000 or more in violation of Tennessee Code Annotated § 39-14-408, and against the peace and dignity of the State of Tennessee.

Although the indictment lists the physical address of the DDC and not the individual property vandalized by the defendant, this does not render the indictment invalid. The indictment cited to the vandalism statute, stated the allegations in ordinary and concise language, and sufficiently identified the offense with which the defendant was charged. The indictment, therefore, provided sufficient information to enable the defendant to know the accusation to which an answer was required, to furnish the trial court with an adequate basis for entry of a proper judgment, and to protect the defendant against double jeopardy. *See Hill*, 954 S.W.2d at 727. Moreover, the proof at trial showed the defendant did, in fact, cause damage or destruction to the physical building listed at the address on the indictment when he hid contraband in the walls. Accordingly, we conclude the indictment was sufficient to fulfill the "overriding purpose of notice to the accused." *Hammonds*, 30 S.W.3d at 300. The defendant is not entitled to relief on this issue.

## II.    Motion to Exclude Costs

The defendant argues the trial court erred in denying his motion to exclude the costs to rekey the DDC and to review the surveillance footage. The defendant contends the costs are not proper damages of vandalism and, therefore, cannot constitute value. He also contends the evidence is irrelevant and unfairly prejudicial. The State submits the trial court properly denied the defendant's motion to exclude the costs.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair

- 18 -

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

At the pre-trial hearing, the State argued the evidence was relevant to show the defendant had "tampered with property and caused pecuniary loss or substantial inconvenience to the owner" because the DCSO could no longer use their "entire operating system" "once it's compromised and it was compromised by the taking of the keys." Additionally, the State argued that value is a question for the jury and should not be decided prior to trial. The trial court found "the jury['s] purview in determining valuation for vandalism is clearly established in both statute and pattern instructions." The court expressed doubt that "authenticated proof of expenses and costs of repair or replacement would confuse or mislead the jury" and stated that it had "faith the eventual jurors in this matter [would] ultimately determine appropriate or inappropriate financial outlays in their consideration of all proof."

The evidence of the costs to rekey the DDC and review surveillance footage was probative and relevant to determining the value of the damages to the DDC. *See* Tenn. R. Evid. 401, 402. As discussed *infra*, "[t]he jury is tasked with determining the value of the stolen or damaged property." *State v. Goldberg*, No. M2017-02215-CCA-R3-CD, 2019 WL 1304109, at *9 (Tenn. Crim. App. Mar. 20, 2019), *perm. app. denied* (Dec. 5, 2019) (internal citations omitted).

Although the defendant contends the evidence related to the costs only served to "inflame[] the jury" and "distract[] them from the ultimate issues," we disagree. The State charged and, therefore, had to prove the defendant caused damage in excess of $250,000. Because the defendant admitted to vandalizing the DDC, the amount of damages was the "ultimate issue" for the jury to decide. Accordingly, the evidence related to the damages caused by the defendant was not so prejudicial as to outweigh its probative value. The defendant is not entitled to relief on this issue.

## III. Motion to Suppress the Product of a Judicial Subpoena

The defendant argues the trial court erred in denying his motion to suppress the product of a judicial subpoena. Specifically, the defendant contends the subpoena lacked

an affidavit, the application failed to provide "articulable reasons" or a "nexus," the scope of the request was unreasonably broad, and the subpoena violated the defendant's constitutional rights because the requested records should have been obtained through a search warrant. The defendant also contends that he has standing to challenge the subpoena because he had an interest in the documents sought by the subpoena and maintained a personal privacy interest in the documents. The State contends the trial court properly denied the defendant's motion to suppress.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at \*2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at \*2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures. These guarantees exist to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629.

Under Tennessee Code Annotated section 40-17-123(a), a law enforcement officer may obtain a subpoena for the production of books, papers, records, documents, tangible things, or information and data electronically stored for the purpose of investigating or gathering evidence to prosecute a criminal offense. To obtain a judicial subpoena the officer shall prepare an affidavit in support of the request stating "with particularity" the following:

(1)     A statement that a specific criminal offense has been committed or is being committed and the nature of the criminal offense;

(2)     The articulable reasons why the law enforcement officer believes the production of the documents requested will materially assist in the investigation of the specific offense committed or being committed;

(3)     The custodian of the documents requested and the person, persons, or corporation about whom the documents pertain;

(4)     The specific documents requested to be included in the subpoena; and

(5)     The nexus between the documents requested and the criminal offense committed or being committed.

*Id.* § 40-17-123(c)(1)-(5).  The trial court must examine the affidavit and shall grant the request for a subpoena if the court finds that the affiant presented a reasonable basis to believe the following:

(A)     A specific criminal offense has been committed or is being committed;

(B)     Production of the requested documents will materially assist law enforcement in the establishment or investigation of the offense;

(C)     There exists a clear and logical nexus between the documents requested and the offense committed or being committed; and

(D)     The scope of the request is not unreasonably broad or the documents unduly burdensome to produce.

*Id.* § 40-17-123(d)(1).  If the person to whom the subpoena is directed wishes to challenge the subpoena, they must file a motion to quash or modify the subpoena within seven days of service.  *Id.* § 40-17-123(k).

We need not tarry long in resolving this issue.  Although the defendant asserts that he has standing to challenge the subpoena based on his interest in legal documents that were "copied and kept without his knowledge," he failed to file a motion to quash the subpoena and did not file a motion to suppress until July 15, 2022, despite being informed about the judicial subpoena on at least July 6, 2021, when the trial court ordered the production of the judicial subpoena records from the issuing judge.  Accordingly, we conclude the defendant has waived his issue regarding the validity of the judicial subpoena because he failed to file a timely motion to quash.  *See State v. Mendenhall*, No. M2010-

01381-CCA-R3-CD, 2013 WL 360525, at *55 (Tenn. Crim. App. Jan. 30, 2013) (holding the defendant waived his claim regarding the validity of a judicial subpoena when he failed to file a motion to quash and instead filed a motion to suppress the subpoena nineteen months after learning of its existence), *perm. app. denied* (Tenn. June 11, 2013). The defendant is not entitled to relief on this issue.

Despite the defendant's waiver of this issue, we also note that the defendant lacked standing to challenge the subpoena as he had no privacy interest in the copied documents.

Courts use the doctrine of standing to assess whether a party has "a sufficiently personal stake" in a case to warrant judicial relief. *State v. Harrison*, 270 S.W.3d 21, 27-28 (Tenn. 2008). If the party's "rights or interests" have not been impacted, the party has no standing and is not entitled to relief. *Id*. at 28. In the judicial subpoena context, the Tennessee Supreme Court has held that "[a] person has standing to challenge a subpoena issued to a third party," if that person "asserts a personal right, privilege, or proprietary interest in the materials being sought by the subpoena." *Id*. at 29. On the flip side, a person without "a legally protectable interest" in the subpoenaed materials "has no standing to challenge either the form of a subpoena issued to a third party or the manner in which the subpoena was issued." *Id*. at 28. The defendant claims he has standing to challenge the judicial subpoena based on his Fourth Amendment privacy interest. But, as discussed, that interest was extinguished when he voluntarily ceded control of the documents to Ms. Bobbitt. Because the defendant has not asserted any valid interests in the documents, he lacks standing to challenge the judicial subpoena. *See Harrison*, 270 S.W.3d at 28-29.

To claim Fourth Amendment protection, "a defendant must demonstrate that he personally" has a reasonable expectation of privacy in the place searched or property seized. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Courts apply a two-pronged inquiry to determine whether a defendant has a "legitimate" privacy interest: "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010) (quoting *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001)). It is well-established that there is no "legitimate expectation of privacy in information" voluntarily given to third parties. *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). The United States Supreme Court has repeatedly held that the Fourth Amendment allows the government to obtain information that the defendant gave to a third party, even if it was revealed "for a limited purpose" with the assumption that "the confidence placed in the third party [would] not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976). So long as no Fourth Amendment interests are implicated, this "third-party doctrine" applies. *Id*. at 444.

- 22 -

The defendant willingly gave the documents to Ms. Bobbitt, a third party, to be notarized. He did not object when she told him that she planned to copy and retain that copy of the documents, or when she took the documents to make the copies. Even if he disclosed the documents only for the limited purpose of having her notarize them, with the unspoken expectation that she would keep them private, his actions destroyed any reasonable expectation of privacy he may have had in the documents. *See United States v. Friedmann*, 2022 WL 950871, at \*10-11 (M.D. Tenn. Mar. 29, 2022) (applying the third-party doctrine and concluding that the defendant had "no legitimate expectation of privacy in the documents" that Ms. Bobbitt notarized).

Based on the defendant's lack of privacy interest in the copies he willingly allowed Ms. Bobbitt to retain, the defendant lacked standing to challenge the judicial subpoena. Accordingly, the defendant is not entitled to relief.

## IV. Sufficiency

The defendant argues the evidence was insufficient to support his conviction for vandalism of property over $250,000. The defendant contends he did not damage the locks and surveillance cameras and, therefore, did not vandalize them. Additionally, the defendant claims the amounts used by the State to prove value, the costs to rekey the locks and review video footage, were not appropriate means of determining value under the statute. The State contends the evidence is sufficient.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary

instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of vandalism of property over $250,000. As charged in this case, a person commits vandalism when the person knowingly causes damage to or the destruction of any real or personal property of another or of the state, the United States, any county, city, or town and knows that the person does not have the owner's effective consent. Tenn. Code Ann. § 39-14-408(b)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). Vandalism is a Class A felony if the value of the property is more than $250,000. *Id.* § 39-14-105(a)(6). Damage includes, but is not limited to:

(A)     destroying, polluting, or contaminating property; or

(B)     tampering with the property and causing pecuniary loss or substantial inconvenience to the owner or a third person.

*Id.* § 39-14-408(a)(1). At the time of the offense, value of property was defined as follows:

(A)     Subject to the additional criteria of subdivisions (a)(38)(B)-(D), "value" under this title means:

(i)     The fair market value of the property or service at the time and place of the offense; or

(ii)     If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

. . . .

(C)    If property or service has value that cannot be ascertained by the criteria set forth in subdivisions (a)(38)(A) and (B), the property or service is deemed to have a value of less than fifty dollars ($50.00)[.]

Tenn. Code Ann. § 39-11-106(38) (2018). "[T]his court has consistently held that the value of the cost of repairs is an appropriate method of determining the value of damage sustained by vandalized property." *State v. Bolton*, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *9 (Tenn. Crim. App. Jan. 31, 2014), *no perm. app. filed*. This Court has "even approved the use of replacement or repair costs to determine value when the fair market value has not been addressed and could feasibly have been determined." *Id.* (internal citations omitted). "The jury is tasked with determining the value of the stolen or damaged property." *Goldberg*, 2019 WL 1304109, at *9 (internal citations omitted).

Here, the defendant does not dispute that he briefly removed a set of keys from the DDC, examined other keys while in the building, and "damag[ed] the 'brick and mortar' of the jail by cutting into it to hide contraband." Instead, the defendant argues the State failed to sufficiently prove the value of the damages. Specifically, the defendant contends he did not cause any damage to locks or cameras and, therefore, did not vandalize them. Additionally, the defendant contends that the State failed to prove "the cost to rekey the locks corresponding to the keys [the defendant] actually took" and that the video review costs included a "significant and unknown amount of time spent on other matters." The State contends the evidence was sufficient to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence shows the defendant entered the DDC numerous times over a five-month period dressed as a construction worker and hid contraband, including firearms, razor blades, saw blades, and handcuff keys inside the walls throughout the building during its construction. On December 27, 2019, the defendant took a maintenance key ring from the key control room and left the building for approximately two hours. When he returned, the keys were on a different key ring, and two keys, a general movement key and a kitchen padlock key, were missing. Sheriff Hall testified that there was no alternative other than rekeying every lock in the building because there was no way of knowing whether the defendant made copies of the keys while they were in his possession. Lieutenant Conrad testified that the maintenance key ring accessed "90-some percent of the facility," and the tampering with and removal of the keys "irreparably harmed the security of the building." Chief Hudson provided a bill from Bell and Associates to rekey the locks in the DDC totaling $291,721. Chief Wilkes emphasized the importance of reviewing the video footage to determine the sites where the defendant hid contraband because the defendant "strategically placed th[o]se devices, razors, cuff keys inside of housing units, in front of the officer workstation and always [] it was in hidden in plain view." Chief Hudson submitted a spreadsheet entitled "Cost of Hours

- 25 -

Worked Reviewing Video" that totaled $335,777, including $55,443 in overtime pay, and testified that every hour reflected in the spreadsheet was spent reviewing surveillance video. Despite the defendant's assertion that his actions cannot be construed as "damage" because he did not physically damage the locks or video cameras, the defendant clearly "tampered with property" by placing contraband within the walls of the DDC and by removing a key ring from the building. These actions "irreparably harmed the security of the building" and "caus[ed] pecuniary loss or substantial inconvenience to the owner." Additionally, the jury determined that the amount of damage to the DDC was over $250,000, as was its prerogative.[5] The defendant is not entitled to relief on this issue.

Couched inside his sufficiency argument, the defendant also argues the vandalism statute is unconstitutionally vague as applied to him. He contends that, if his conviction is allowed to stand, "prosecutors will be emboldened to further turn the drafting of indictments into creative writing assignments to seek punishment beyond that intended by the legislature." The State contends the defendant's argument is waived because it is a separate issue from sufficiency and should have been presented on its own. The State also notes that the defendant did not include this issue in his statement of issues. Appellate briefs must contain a statement of issues presented for review and an argument setting forth the appellant's contentions, reasons for appellate relief with citations to authorities and the record, and the applicable standard of review. Tenn. R. App. P. 27. Appellate review is generally limited to issues presented for review. *See* Tenn. R. App. P. 13(b); *State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014) (citing *Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012)). An appellate court may decline to consider issues that a party failed to raise properly. *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018) (citing, inter alia, *Bishop*, 431 S.W.3d at 43). In his reply brief, the defendant contends his argument was "clearly and squarely raised" because it was presented as an alternative position. Although the defendant contends he articulated this argument in "seeking a judgment of acquittal," he failed to include the issue in his motion for new trial and, therefore, the issue is waived. *See* Tenn. R. App. P. 3(e); *see also State v. Carter*, 687 S.W.2d 292, 293-94 (Tenn. Crim. App. 1984).

## V.      *Jencks*[6] / *Brady*[7] **Violations**

---

[5] While at trial the State argued that the time officers spent reviewing the surveillance did so to the neglect of their regularly assigned duties and, therefore, that amount should be included in the damages calculation, the testimony at trial revealed that those officers would have been paid a normal week's wage whether they were reviewing the video or attending to their regular duties. Therefore, we conclude that the only expense associated with the defendant's vandalism would be the overtime hours totaling $55,433. However, due to the fact that the rekeying alone cost over $250,000, the evidence as to value is sufficient to sustain the jury's verdict.

[6] *Jencks v. United States*, 353 U.S. 675 (1957).

[7] *Brady v. Maryland*, 373 U. S. 83 (1963).

The defendant argues the State failed to timely provide the evidence to which he was entitled. The defendant contends the State's numerous discovery violations created prejudice which necessitates a new trial. The State contends the defendant is not entitled to relief for the delayed disclosure of Investigator Ford's file.

Following the direct examination of the State's first witness, Sheriff Hall, lead counsel asked for "any *Jencks* material." The trial court asked the State if it had provided what was required, and the prosecutor replied, "Yes, Your Honor." After cross-examining Sheriff Hall, lead counsel made a "standing request under Rule 26 so we don't have to do it under each witness." The State assured the trial court that it had "nothing beyond what's already been provided." During Lieutenant Conrad's cross-examination, lead counsel questioned Lieutenant Conrad about his discussions with Investigator Ford, and Lieutenant Conrad indicated that Investigator Ford "took copious notes" during his interview. During Investigator Ford's cross-examination, he agreed that during his independent, internal investigation into the Sheriff's Department, he took lengthy notes and stated they were in "a case file" in the "records division." He stated that no one ever asked him to pull the "extensive" case file, which contained case notes, documents received from other people, various lists, and video files.

Following Investigator Ford's testimony, a bench conference was held, and the trial court instructed the State to get a copy of Investigator Ford's case file for the defendant. The defendant was finally provided a copy of Investigator Ford's case file on a thumb drive at 5:25 p.m. following the testimony of several additional witnesses. The trial court noted that any *Jencks* material on the thumb drive had been provided three hours late; however, the State assured the trial court that the defendant had much of the information in the case file for "years." The following morning, co-counsel requested a sixty-minute recess to meet with the defendant and "go over with him the extent of materials that we received." Co-counsel stated that, despite both lead counsel and co-counsel reviewing the case file until 11:00 p.m., they were unable to review its entire contents. He noted that the file included recorded interviews of two witnesses who had already testified, Chief Dial and Lieutenant Conrad. The State responded that it was not aware of the case file's existence prior to Investigator Ford's testimony and argued that Investigator Ford "did an independent internal investigation within the sheriff's department, not a law enforcement investigation." The State acknowledged three pieces of *Jencks* material in the case file: interviews with Lieutenant Witkus, who had not testified at the time the case file was turned over to the defendant, Lieutenant Conrad, and Chief Dial. The State also told the trial court that Investigator Ford, Lieutenant Conrad, and Chief Dial would make themselves available to be recalled if the defendant chose to do so. When the trial court asked co-counsel if the remedy he was seeking for the *Jencks* violation was time to go over the case file with the defendant, co-counsel agreed.

## A.    *Jencks* Violation

The defendant contends the State "clearly violated Rule 26.2 by failing to provide pre-trial statements contained in [Investigator Ford's] investigative file immediately after the direct testimonies of several witnesses."  The State argues the defendant agreed to the trial court's remedy for the *Jencks* violation, and therefore, he cannot complain about it on appeal.

Tennessee Rule of Criminal Procedure 26.2(a), commonly referred to as "The *Jencks* Rule," requires that:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

A statement is defined as:

> (1)    A written statement that the witness makes and signs, or otherwise adopts or approves; or
>
> (2)    A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

Tenn. R. Crim. P. 26.2(f).  Sanctions for failure to produce the statement may include striking testimony or declaring a mistrial.  Tenn. R. Crim. P. 26.2(d).  "The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial."  *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993).

Here, the State concedes Investigator Ford's case file, which contained three *Jencks* statements, was not provided to the defendant until the end of the first day of trial.  The following morning, co-counsel requested "a reasonable time of an hour, hour and a half to go over this today, this morning before [the State] put on any more witnesses."  The trial court agreed that the material should have been turned over earlier and said, "[t]he issue is what is now the remedy.  So you're asking for an hour[?]"  Co-counsel agreed, "[a]t least until we go through it."  The State also indicated that the witnesses affected by the *Jencks* material were available to be recalled by the defendant.  Following the recess, lead counsel

- 28 -

indicated that trial counsel "fe[lt] satisfied that [they had] reviewed what [they] believe[d] to be the *Jencks* material at least with [their] client and [they were] ready to proceed." The defendant now asserts the trial court erred in failing to either strike the witnesses' testimony or declare a mistrial. However, these sanctions are only necessary if the State disobeys an order to deliver a statement. *See* Tenn. R. Crim. P. 26.2(d). Here, the State produced the statements; however, it was a delayed disclosure. Trial counsel requested a recess to review the material with the defendant, the trial court granted the recess, and trial counsel stated they were "ready to proceed." Accordingly, the defendant cannot now complain of the remedy they received. Moreover, Lieutenant Conrad and Chief Dial were available to be recalled, and the defendant chose not to do so. Accordingly, the defendant is not entitled to relief on this issue.

### B. *Brady* Violation

The defendant argues the State committed a *Brady* violation by failing to timely disclose Investigator Ford's case file. The defendant contends the State's failure denied the defendant "a meaningful opportunity to review and utilize [the case file] during trial." The State contends the defendant is not entitled to relief for the delayed disclosure of Investigator Ford's case file.

Suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (internal citations omitted).

Evidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000). A reviewing court must determine whether the defendant

has shown that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict. *Johnson*, 38 S.W.3d at 58 (internal quotations omitted).

In addition, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). This includes "evidence in police possession which is not turned over to the prosecution." *Jackson*, 444 S.W.3d at 594. However, the prosecution is not required to disclose information that the defendant either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56.

However, this Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting) (citations omitted). When there is a delayed disclosure of evidence, rather than complete non-disclosure of significant exculpatory evidence, this Court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Id.* "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002)). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured. *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *9 (Tenn. Crim. App. June 19, 1998), *perm. app. denied* (Tenn. Feb. 22, 1999).

### i. Chief Dial's Document Regarding Keys

The defendant argues the DCSO report created by Chief Dial "went directly to [the defendant's] defense that his actions did not require rekeying of every lock." The State contends the document provided no new information and was immaterial.

At the motion for new trial hearing, Chief Dial agreed that he created a set of documents prior to the defendant's actions "in order to have accountability of key sets." For each key ring, Chief Dial assembled a "roster [of] where the individual keys go for accountability purposes," and he agreed that they were provided to Investigator Ford for his case file. Chief Dial also testified that he created a document summarizing the effects

of the stolen maintenance key ring. He agreed that the document was titled "detention doors – 113 total." Each key on the maintenance key ring was listed with the number of detention doors it affected. Chief Dial emphasized that "this was a document that [he] put together solely focused on the initial stolen keys" and that it was created prior to the DCSO's knowledge of the full extent of the defendant's actions. On cross-examination, Chief Dial agreed that nothing in these documents changed his testimony at trial.

We conclude the delayed disclosure of Chief Dial's documents was not prejudicial. First, we note that the information contained within the documents was not exculpatory. Additionally, during trial, Chief Dial testified that he "kept extensive inventories of everything, particularly the maintenance key set" and that those inventories were provided to Investigator Ford. He also testified at trial that the maintenance key ring affected "100 or so [detention] doors." When trial counsel received Investigator Ford's case file following Chief Dial's testimony, he failed to recall Chief Dial and question him regarding the documents. Moreover, lead counsel questioned the witnesses at trial extensively about the key system and how many locks were affected by the defendant's actions. Accordingly, the defendant is not entitled to relief on this issue.

### ii. The Defendant's Remaining *Brady* Claims

The defendant also argues Investigator Ford's handwritten note regarding a media prep meeting could have been used to impeach Sheriff Hall; Investigator Ford's numerous descriptions of the defendant's actions as "theft" instead of "vandalism" "went directly to [the defendant's] primary case theory on that issue"; discrepancies in interview times listed in Investigator Ford's notes and employee time logs could have been used to impeach witnesses; and Investigator Ford's written concerns about DCSO employees "skipping days" while reviewing video footage impeached the accuracy of the time logs. Despite the defendant's many assertions, he does not include appropriate citations to the record directing us to the evidence he is challenging. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Crim. Ct. App. 10(b). The appellate record in this case consists of over 1,700 pages. "[I]t is not the duty of this court to scour the record in search of the facts supporting a defendant's argument." *State v. Moore*, No. M2015-00663-CCA-R3-CD, 2016 WL 3610438, at *8 (Tenn. Crim. App. June 28, 2016), *perm. app. denied* (Tenn. Nov. 17, 2016). By failing to support his arguments with proper references to the record, the defendant has waived our consideration of these issues.

Furthermore, the challenged evidence was cumulative impeachment evidence and relatively insignificant in comparison to the evidence submitted at trial. *See Turner v. United States*, 582 U.S. 313, 327-28 (2017) (cumulative impeachment evidence is not necessarily material for the purpose of *Brady*); *see also United States v. Salem*, 578 F3d

682, 688 (7th Cir. 2022) (stating that, ordinarily, newly discovered impeachment evidence does not require a new trial under *Brady* as it is often cumulative of other impeachment evidence presented at trial). Finally, the defendant had the opportunity to recall witnesses and present the evidence at trial and chose not to do so. The defendant, therefore, is not entitled to relief on this issue.

## VI. Improper Argument

The defendant argues the prosecutor made an improper comment during rebuttal closing argument when he presented an improper hypothetical, comparing the defendant to a baby molester. The State contends any error in the prosecutor's comment was harmless.

During the State's closing argument, the prosecutor made the following statement:

He put so much planning, not only what he was going to do, when he was going to do it, where he was going to put things. All of this went into Defendant's plan, which destroyed our jail. [Our] jail that was the baby of the sheriff and the people that he trusts and works with. They were so proud of that building and somebody they let into their meetings, who had a place at the table did this to them and to the people of Davidson County.

Lead counsel later made the following statement during closing argument:

And so I submit to you that they just wanted to cover you with all of these facts, all of this information so that you will be just as upset with him as the Sheriff's Office clearly is. Which we can't blame them for. I'm not blaming the Sheriff's Office for being mad and Sheriff Hall and everybody that you heard from that office. They didn't want to talk to me and they didn't have to, I understand that. And I'm not blaming them for being upset. I would be mad if somebody went into my house and did what [the defendant] did, anybody would be mad about that.

Finally, during rebuttal closing argument, the following exchange occurred:

Prosecutor:          And is [lead counsel's] feelings hurt because the sheriff officers, the deputy, people who testified wouldn't talk to them. Well, if it was your baby that had been molested, you may not want to talk to the defense attorney who is representing the molester either.

Lead Counsel:       Your Honor, can we approach.

- 32 -

Trial Court:          Okay.

(Whereupon, the following bench conference was conducted out of the hearing of the jury)

Lead Counsel:        Your Honor we –

Trial Court:          He say that's informal to make a child –

Prosecutor:          I didn't –

Trial Court:          He's referencing [Sheriff] Hall it's his baby and the – well move along.  All right.  Go ahead.

After the bench conference was concluded, the prosecutor resumed his closing argument as follows:

Prosecutor:          The witnesses have a right to speak to whoever they want to.  They didn't have to talk to us if they didn't want to, but obviously we are the prosecutors.

Closing arguments are an important tool during trial, so attorneys are given a wide-range of autonomy when making them, and the trial court has a wide-range of discretion when controlling them.  *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix).  "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law."  *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).  It is possible for five general areas of prosecutorial misconduct to occur during closing arguments:

(1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Id*.  "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether

the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Initially, we note the trial court immediately told the prosecutor to "move along," and the prosecutor moved on to another topic. While the defendant objected to the State's closing argument, the defendant never requested the trial court provide a curative instruction or other remedy in response to the State's argument. A trial court should provide a curative instruction once an objection to improper argument is made. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024). However, if the trial court fails to give a curative instruction *sua sponte*, then counsel for the party has the obligation to request the trial court to provide a curative instruction. *Id*. If the party fails to request a curative instruction, or is dissatisfied with the instruction and fails to request a more complete instruction, then the party waives this issue for appellate purposes. *Id*. Because the defendant never asked the trial court for a curative instruction or other remedy in response to the State's argument, he has waived this issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Bell*, No. M2019-01810-CCA-R3-CD, 2021 WL 794771, at *6 (Tenn. Crim. App. Mar. 2, 2021) (reiterating that when a defendant fails to ask for a curative instruction, he waives the issue on appeal). As such, this issue is waived.

While this Court may consider an otherwise waived issue for plain error, the defendant has not asked for plain error review, much less shown that he is entitled to plain error review. *See* Tenn. R. App. P. 36(b); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). In order to establish plain error relief, he defendant must meet all the following criteria are satisfied: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant has not shown that consideration is necessary to do substantial justice. Because the proof of the defendant's guilt is overwhelming, he cannot show that the prosecutor's comment, especially when read within the entirety of both closing arguments, was "of sufficient magnitude that it probably changed the outcome of the trial[.]" *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010). Therefore, he is not entitled to plain error relief, and the defendant is not entitled to relief on this issue.

## VII.   Excessive Sentence

The defendant argues the trial court erred in imposing an excessive sentence. Specifically, the defendant contends the trial court improperly weighed the enhancement and mitigating factors and misapplied enhancement factor (14). The State contends the trial court properly weighed the enhancement and mitigating factors.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. §§ 40-35-113, -114, -210(b).   In addition, the court must consider the defendant's potential for rehabilitation, and "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4), (5).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c).   Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5).   The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the

burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Here, the trial court applied enhancement factors (1), the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (9), the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; (10), the defendant had no hesitation about committing a crime when the risk to human life was high; and (14), the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense[.] Tenn. Code Ann. § 40-35-114(1), (9), (10), (14). The trial court gave weight to enhancement factors (1), (9), and (10) and little weight to factor (14). In mitigation, the trial court gave minimal weight to the defendant's pre-trial punishment under the catch-all factor (13). *Id.* § 40-35-113(13).

## A.      Enhancement Factors

The defendant argues the trial court misapplied enhancement factor (14). Specifically, the defendant contends that his conduct did not support the trial court's finding that he used a position of trust to facilitate the offense. The defendant also contends the trial court gave too much weight to the weapons found during the search of the storage totes. The State contends the trial court properly weighed the enhancement factors.

In considering enhancement factor (14), the trial court noted,

> Abused a position of trust. That goes back to [the defendant] being the prison reform consultant and criminal justice expert. According to – I think it was [Chief] Wilkes, at the time of the trial, he testified that [the defendant] was in on meetings about the Downtown Detention Center. Sheriff Hall wasn't aware of it. [Chief] Wilkes said it was. So that testimony was present. And just overall I think that enhancing factor – I'm not giving it great weight . . . but I think it does have to be mentioned and is present because he's wearing disguises so to speak, changing his outfits, using his knowledge of the criminal justice system to commit this offense. That all of his motivation for doing it, to get back at the criminal justice system based on his treatment whether the '87 rape happened again.

Enhancement factor (14), requiring a finding that the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense, "requires a finding, first, that defendant occupied a position of trust" and then a determination of "whether the position occupied

was abused by the commission of the offense." *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). Our supreme court has explained that, when examining whether a defendant has abused a position of public or private trust, "a court must look to 'the nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.'" *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *Kissinger*, 922 S.W.2d at 488). The record does not contain any evidence showing that the defendant held a position of public or private trust. However, our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Bise*, 380 S.W.3d at 706. Accordingly, while the trial court erred in applying this factor, that error does not necessarily require an invalidation of the sentence.

> Regarding enhancement factor (1), the trial court noted,

> The defendant has a previous history of criminal behavior and criminal convictions in addition to those necessary to establish a range. That would only be one additional felony, he has the agg robbery, assault with the intent to commit murder from '89. He's out less than a year and that sentence, that was probated somehow back then, and gets this new attempted aggravated robbery from 1992. And all of those offenses involve weapons or the attempt, I guess, maybe didn't, but all of the others do and then we have all this information here today from – I have no clue how in the world is [the defendant] getting access to 26 guns, assault weapons, being a three-time conviction felon. That's criminal behavior. I have no clue how that happened, but it happened somehow.

> I get that he will be sentenced on the gun charges in federal court and they [are] going to be the latter sentencing court and they can decide how that runs with the sentence in this case, but that enhancing factor is present.

The trial court gave this factor "great weight." The record supports the trial court's findings. Although the defendant argues the trial court gave undue weight to this enhancement factor, "mere disagreement with the weight the trial court gives to properly assigned factors is not grounds for appeal." *State v. Rousseau*, No. M2023-01320-CCA-R3-CD, 2024 WL 2797436, at *6 (Tenn. Crim. App. May 31, 2024), *perm. app. denied* (Tenn. Aug. 14, 2024).

### B. Mitigating Factors

The defendant also asserts that, in addition to his pre-trial punishment, the trial court should have considered several other facts under the catchall mitigating factor (13). Specifically, he contends: (1) that the length of time that has passed since his prior convictions is over thirty years and would not be considered under federal law; (2) that he presented a reasonable basis to conclude that he is a rape survivor and, therefore, presented a reasonable basis for committing the offense; and (3) that he presented numerous letters of support outlining his positive contributions to society.

Although the trial court did not specifically address these facts when discussing the mitigating factors, the trial court stated that it read "all of the letters" of support and noted the authors were "relying on what information [the defendant's] given them about the case and about his reasoning for committing this vandalism." The trial court also discussed the defendant's pre-sentencing letter and allocution in depth, finding the defendant's explanation "highly suspect" and stating it "raises a lot of questions that we won't have answers to." The trial court noted "the defense has presented several" mitigating factors before discussing two factors in depth and finding that one applied.

In this case, enhancement factors (1), (9), and (10) were applicable to the defendant's conviction. Our review of the record indicates the trial court imposed a sentence within the applicable range after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, the potential for rehabilitation, and the evidence of enhancement and mitigating factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). The defendant is not entitled to relief on this issue.

## VIII. Motion for Reduced Sentence

The defendant argues the trial court erred by denying his Rule 35 motion for reduced sentence. The State contends the trial court properly exercised its discretion by denying the motion for reduced sentence.

Tennessee Rule of Criminal Procedure 35(a) provides that a defendant may petition the trial court for a reduction of sentence within one hundred and twenty days of the entry of judgment or the revocation of probation. Rule 35 allows for the modification of a sentence when appropriate in the interest of justice. *State v. Hodges*, 815 S.W.2d 151, 154 (Tenn. 1991). Our standard of review is whether the trial court has abused its discretion in denying a defendant's motion for reduction of sentence. *State v. Irick*, 861 S.W.2d 375, 976 (Tenn. Crim. App. 1993).

In his motion requesting a reduced sentence, the defendant argued the trial court's sentencing determination was "based on erroneous information due to limited evidence presented in court." In support of his contention that he acted alone, the defendant submitted an affidavit attesting to his interactions with the "lookouts" as well as an interview summary from the police officer who interviewed one of the "lookouts." Additionally, the defendant submitted photographs taken inside the CJC during the defendant's 2016 tour. The defendant stated that the photographs were from inside the cell where he was allegedly raped and, therefore, rebutted the testimony of Sheriff Hall. In its order denying the motion for reduced sentence, the trial court found the "'other information' [did] not alter its ruling." We note the trial court found that enhancement factor (2), the defendant was a leader in the commission of an offense involving two (2) or more criminal actors, was not applicable in this case. As stated above, the trial court's findings at the sentencing hearing were supported by the record. Accordingly, the court did not abuse its discretion by denying the Rule 35 motion, and the defendant is not entitled to relief on this issue.

## IX.    Cumulative Error

Finally, the defendant contends the cumulative effect of the errors alleged above entitles him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Hester*, 324 S.W.3d at 77. Because the defendant has not established any error, he is not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the trial court is affirmed.


s/ J. ROSS DYER
J. ROSS DYER, JUDGE

- 39 -